UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**ANDREW D. MALKASIAN,**

    **Plaintiff,**

    v.                                                       Case No. 18-CV-1371

**ANDREW M. SAUL,**
**Commissioner of Social Security,**

    **Defendant.**

---

## DECISION AND ORDER

---

Andrew D. Malkasian seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying his claim for a period of disability and disability insurance benefits under the Social Security Act, 42 U.S.C. § 405(g). For the reasons below, the Commissioner's decision is affirmed.

## BACKGROUND

Malkasian filed an application for a period of disability and disability insurance benefits alleging disability beginning on January 20, 2014 due to epilepsy with seizures. (Tr. 178.) Malkasian's application was denied initially and upon reconsideration. (Tr. 13.) Malkasian filed a request for a hearing and a hearing was held before an Administrative Law Judge ("ALJ") on June 9, 2017. (Tr. 28–66.) Malkasian testified at the hearing, as did his mother, Joyce Malkasian, and Kelly Stroker, a vocational expert. (Tr. 28.)

In a written decision issued August 2, 2017, the ALJ found that Malkasian had the severe impairments of epilepsy disorder and seizure disorder. (Tr. 15.) The ALJ considered Malkasian's impairments under Listing 11.02 – Epilepsy; however, he found that Malkasian's

medical records did not show the frequency of seizures necessary to either met or medically equal the listing. *See* 20 C.F.R. pt. 404, subpt. P, app. 1 (the "listings"). (*Id.*) The ALJ found that Malkasian had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following nonexertional limitations: no ladders, scaffolds, or ropes; avoid all exposure to hazardous, moving machinery and unprotected heights; limited to simple, routine, and repetitive tasks; and employed in a low stress job defined as only occasional decision-making required and only occasional changes in the work setting. (Tr. 16.)

While the ALJ found that Malkasian was unable to perform any of his past relevant work, the ALJ determined that given Malkasian's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that he could perform. (Tr. 18.) As such, the ALJ found that Malkasian was not disabled from his alleged onset date until the date of the decision. (Tr. 19.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied the plaintiff's request for review. (Tr. 1–5.)

## DISCUSSION

### 1. *Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions

2

drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

### 2. *Application to this Case*

Malkasian argues the ALJ erred in finding that he did not meet Listing 11.02–Epilepsy. To meet Listing 11.02, one must show "epilepsy, documented by a detailed description of a typical seizure and characterized by A, B, C, or D." Listing 11.02. Malkasian acknowledges that his seizures do not meet listing level for subsections A and C, which address generalized tonic-clonic seizures. (Pl.'s Br. at 13, Docket # 14.) Rather, Malkasian asserts that his seizures meet Listing 11.02B, which addresses dyscognitive seizures. (*Id.* at 17.) Dyscognitive seizures are "characterized by alteration of consciousness without convulsions or loss of muscle control. During the seizure, blank staring, change of facial expression, and automatisms (such as lip smacking, chewing or swallowing, or repetitive simple actions, such as gestures or verbal utterances) may occur. During its course, a dyscognitive seizure may progress into a generalized tonic-clonic seizure." Listing 11.02H1b.

3

To meet Listing 11.02B, one must show: "Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C)." Again, the ALJ found Malkasian did not meet Listing 11.02 because the medical record did not show the frequency of seizures required to meet the listing.

The plaintiff has the burden of showing that his impairments meet or medically equal a listing. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). To establish that an impairment or combination of impairments meet or are equivalent to a listed impairment, a plaintiff must present medical findings that meet or are equal in severity to all of the criteria in a listing. *Sullivan v. Zebley*, 493 U.S. 521, 530–31 (1990) (citing SSR 83–19 and 20 C.F.R. § 416.926(a)). The Seventh Circuit has stated that an ALJ's "failure to discuss or even cite a listing, combined with an otherwise perfunctory analysis, may require a remand." *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (internal citation omitted). However, the court has also found that "the ALJ may rely solely on opinions given in Disability Determination and Transmittal forms and provide little additional explanation . . . . [if] there is no contradictory evidence in the record." *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006). Furthermore, "[a]lthough an ALJ should provide a [listings] analysis, a claimant first has the burden to present medical findings that match or equal in severity all the criteria specified by a listing." *Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009) (internal citations omitted).

Malkasian argues that the ALJ's analysis regarding Listing 11.02 is too sparse. (Pl.'s Br. at 14–15.) I disagree. While the ALJ may not have provided lengthy discussion in section four of the decision, he makes clear Malkasian does not meet Listing 11.02 because the record

4

does not show the frequency of seizures required to meet the listing. (Tr. 15.) More importantly, Malkasian does not meet his initial burden of presenting medical findings that show he would meet Listing 11.02B. Malkasian's argument that he meets Listing 11.02B rests almost entirely on the fact that Dr. Janel Schneider, his treating epileptologist, opined that Malkasian generally met Listing 11.02 and on the statements of his family members regarding the frequency of his seizures. (Pl.'s Br. at 13–18.) The problem, however, is that Malkasian's and his family member's statements regarding the frequency of his dyscognitive seizures are wildly inconsistent with his treatment records, particularly the records from Dr. Schneider.

Again, Malkasian provided an opinion from Dr. Schneider dated June 1, 2017 stating that he met Listing 11.02. (Tr. 473.) However, despite treating Malkasian over a period of several years, Dr. Schneider based this opinion solely on a single appointment on April 26, 2017. (*Id.*) To understand why this opinion so blatantly contradicts the record evidence, I must recount Malkasian's seizure history. Malkasian was diagnosed with epilepsy at least a decade prior to his alleged onset date of January 20, 2014. (Tr. 193.) However, in October 2013, Malkasian experienced three grand mal (also known as tonic-clonic) seizures in one day, causing lasting difficulties with cognitive clouding, extreme fatigue, and episodic periods of decreased responsiveness. (Tr. 328.) After the October 2013 seizures, Malkasian established care with Dr. Schneider, who started him on Levetiracetam (also known as Keppra), in addition to the Lamotrigine therapy he was already taking. (Tr. 336.)

On January 20, 2014 (the alleged onset date), Malkasian was admitted to the hospital for long-term electroencephalogram ("EEG") monitoring. (Tr. 264.) Malkasian reported that over the course of the last year, his seizure frequency had increased, as well as his fatigue, sleepiness, and cognitive clouding. (*Id.*) While he usually went several months between

5

seizures; he more recently experienced dyscognitive seizures every few weeks. (Tr. 267.) Malkasian stated that his seizures were triggered by lack of sleep and missing doses of medication. (Tr. 329.) The EEG revealed frequent electrographic seizures arising from the right frontocentral region. (Tr. 264.) Malkasian was prescribed Keppra and Lamictal. (*Id.*)

After the January 2014 testing, Malkasian treated with Dr. Schneider again in March 2014. (Tr. 328–31.) At this time, Malkasian reported some improvement in his episodic cognitive clouding, but still experienced fatigue and moodiness due to the Keppra. (Tr. 328–29.) However, he experienced no seizure episodes. (Tr. 328.) Dr. Schneider increased his dose of Keppra, as he had significant improvement while taking it. (Tr. 330–31.) In May 2014, Dr. Schneider reported that since Malkasian's last visit, Malkasian's father contacted the office on multiple occasions with concern that the increased Keppra was causing intolerable side effects. (Tr. 332.) Dr. Schneider decreased the dose of Keppra and continued Malkasian on Lamictal. (*Id.*) Dr. Schneider reported "no clear seizure activity" and Malkasian's family was very pleased with the results of his neuropsychological testing. (*Id.*) Dr. Schneider decided to start a trial of Topamax, intending to eventually replace the Keppra with Topamax. (Tr. 334.)

Two EEG studies conducted in August and October 2014 continued to show electrographic seizures (Tr. 256–59); however, when Malkasian treated with Dr. Schneider in January 2015, he admitted that he had been taking a decreased dose of Topamax due to side effects (Tr. 336). Malkasian also reported at this appointment that he began taking CBD oil and discontinued his evening dose of Topamax. (*Id.*) His mother reported that his mood issues resolved and his seizures were "much improved." (*Id.*) A February 2015 EEG showed improvement, though it still detected abnormalities. (Tr. 398, 403–04.) In March 2015, Malkasian's Topamax was increased and he chose to increase his intake of CBD oil. (Tr. 398.)

6

These changes were apparently successful, as Malkasian did not treat with Dr. Schneider again until October 2015, at which time he indicated that he had been seizure-free since the March 2015 visit. (Tr. 409.) Malkasian's wife, who was also present at the visit, stated that he was "back to normal." (*Id.*) While Malkasian reported having a seizure in October after his October appointment with Dr. Schneider, he also admitted he had been non-compliant with his medication at that time. (Tr. 421.) A five-day video EEG exam at the end of January 2016/beginning of February 2016 was normal, showing no focal or epileptiform abnormalities and no electrographic seizures. (Tr. 468–72.)

In early March 2016, Malkasian, attending an appointment with his father, reported that he was "feeling great," was anxious to get back to work, and "has had no episodes concerning for seizure activity." (Tr. 422.) However, at the end of March, Malkasian contacted the clinic reporting a breakthrough seizure, and Dr. Schneider recommended switching medication. (Tr. 432.) In September 2016, Malkasian, with his wife present, told Dr. Schneider that he had no further seizures since the end of March and both he and his wife believed "that there has been a dramatic improvement in both his seizure control and his side effects" after switching to an extended release medication. (Tr. 432.) Malkasian even reported that his wife had a baby two weeks prior and the baby needed heart surgery and while stress and lack of sleep normally triggered seizures, he continued to feel good and was driving again. (*Id.*) In January 2017, Malkasian continued to report being seizure free since March 2016 and continued to drive. (Tr. 444.) However, on April 9, 2017, Malkasian experienced a tonic-clonic seizure and was seen in the emergency room. (Tr. 454.) While medication changes were discussed at the time, Malkasian did not follow-up. (*Id.*)

7

When Malkasian saw Dr. Schneider again on April 26, 2017, his wife, mother, and father were present at the appointment. (*Id.*) His family was understandably concerned, as Malkasian did not have any warning of the last tonic-clonic seizure, when he typically experienced some indication that a larger seizure was coming. (*Id.*) However, at this appointment, Malkasian's family also began to paint a vastly different picture of Malkasian's condition from what was reported over the last several years. While Malkasian reported at this April appointment that he has been feeling "pretty good" since his last visit, his family reported that he was, in fact, experiencing focal seizures at least twice a week but that he was unaware of them, so he was inaccurately reporting them. (Tr. 454.) At this same appointment, the family also discussed with Dr. Schneider the fact that Malkasian was in the process of applying for disability and "[t]hey would like [Dr. Schneider] to provide his attorney may [sic] with additional information." (*Id.*) Dr. Schneider suggested increasing his medication; however, Malkasian stated that he would rather have seizures than deal with the side effects of medication. (Tr. 456.) While Dr. Schneider suggested some alternative treatments, Malkasian "did not want to commit to anything today." (*Id.*) On May 15, 2017, Malkasian's mother provided a written statement that Malkasian experienced several dyscognitive seizures per week. (Tr. 245.) Then on June 1, 2017, Dr. Schneider opined as follows:

> Based on the information provided to me by the patient and his family at his most recent visit on April 26, 2017, I do believe that Mr. Malkasian's diagnosis and current clinical condition meets these criteria [of Listing 11.02.] I refer to my dictation from that visit for further details.

(Tr. 473.) At the June 9, 2017 hearing, Malkasian testified that he experienced dyscognitive seizures on a daily basis (Tr. 43) and his mother testified he experienced them anywhere from several times a week to hourly (Tr. 60).

The ALJ accorded Dr. Schneider's opinion little weight, finding that the opinion was inconsistent with the objective evidence, which demonstrated that Malkasian's seizures did not occur a listing-level frequency and were controllable with medication. (Tr. 17.) The ALJ further gave Malkasian's mother's statement only some weight because she was not professionally qualified or unbiased. (Tr. 18.) The record supports the ALJ's finding that Malkasian's seizures do not reach listing-level frequency. Even assuming Malkasian's family members accurately reported that Malkasian experiences dyscognitive seizures at least once per week, as Malkasian asserts, (Pl.'s Reply Br. at 2, Docket # 20), no one speaks to the listing requirement that the seizures have occurred at this frequency for at least three consecutive months. While Dr. Schneider generally opines that Malkasian meets Listing 11.02, her own records show Malkasian going months without a seizure, including between March 2015 and October 2015 (Tr. 409) and for an approximately one year-period between March 2016 and April 2017 (Tr. 444, 454). As for the other time periods after the alleged onset date, although the records indicate dyscognitive seizure activity and show abnormal EEGs, there is no indication in the record of three consecutive months with weekly seizures. Nor does Malkasian point to any record citations to the contrary that the ALJ overlooked. Malkasian's family members, including his wife, mother, and father, frequently attended Malkasian's appointments with Dr. Schneider. If they believed Malkasian was inaccurately recounting his seizure frequency, they never corrected him. In fact, throughout the relevant time period, his family specifically noted his improvement. (Tr. 336, 409, 432.) Malkasian has not presented medical findings that meet or are equal in severity to all of the criteria in Listing 11.02B. For this reason, the Commissioner's decision is affirmed.

## CONCLUSION

Malkasian argues the ALJ erred in finding he did not meet Listing 11.02B. Malkasian has not met his burden of presenting medical findings that meet or are equal in severity to all of the criteria in Listing 11.02B, specifically the frequency of his dyscognitive seizures. For this reason, the Commissioner's decision is affirmed and the case dismissed.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **AFFIRMED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 9th day of December, 2019.

BY THE COURT

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge